IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

TERESA PAFF,
Plaintiff,

v.                                                          Civil No. 1:23cv1414 (DJN)

LINCOLN LIFE ASSURANCE COMPANY
OF BOSTON,
Defendant.

**MEMORANDUM OPINION**

This matter comes before the Court following a dispute over Plaintiff Teresa Paff's ("Plaintiff" or "Paff") eligibility for long-term disability ("LTD") benefits under a group long-term disability plan subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Defendant Lincoln Life Assurance Company of Boston ("Lincoln") denied Paff's claim for LTD benefits and Paff now seeks the Court's review of that denial. The parties move for final adjudication of their dispute. (ECF Nos. 15, 17.) The parties' cross motions have been fully briefed, rendering them ripe for resolution. For the following reasons, the Court will GRANT Lincoln's Motion for Judgment on the Administrative Record (ECF No. 15) and DENY Paff's Motion for Judgment on the Administrative Record (ECF No. 17).

**I.     BACKGROUND**

Citizens Bank, N.A. ("Citizens") employed Paff as a Home Mortgage Response Specialist from 2017 through 2022. (Admin. Rec. ("AR") (ECF No. 11) at 1.[1]) Paff's role

---

[1] When citing the Administrative Record (ECF No. 11), the Court refers to the pagination in the bottom right-hand corner labeled with "LIN".

consisted of sedentary tasks, including "[e]xerting up to 10 pounds of force occasionally," "constant sitting" and "frequent typing/keyboarding." (AR at 904.) On September 19, 2022, Plaintiff stopped working and claimed disability on the basis of chronic pain and intervertebral disc degeneration. (AR at 1, 17.)

Citizens maintains an ERISA benefits plan for which Plaintiff, as an employee of Citizens, stands eligible. Under the Group Policy, to receive disability benefits, Paff bears the burden of proving that "as a result of Injury or Sickness, [she] is unable to perform the Material and Substantial Duties of [her] Own Occupation." (AR at 1051.) Paff must prove that she met this definition through the Group Policy's "Elimination Period," consisting of 180 "consecutive days of" disability. (AR at 1051–52.)

The primary evidence that Paff offered in support of her claim of disability consisted of her own testimony, office visit notes and a report from her Nurse Practitioner, Diane Burton ("FNP Burton"), and a functional capacity evaluation ("FCE") administered by a physical therapist, Michael Blair ("DPT Blair"). DPT Blair conducted an evaluation of Paff, including three hours of testing, and concluded that "Mrs. Paff would be unlikely to return to working full time as a Customer Advocate for Citizen Bank due to reduced and limited sitting/standing tolerance; being categorized as a high fall risk, reduced strength and ROM; and reduced functional/mobility deficits." (AR at 944, 948.) FNP Burton's report stated that she was "in full agreement with" the FCE's conclusions and that Paff's "severe pain impairs patient's ability to perform all job functions." (AR at 938.)

Although Lincoln granted Paff short-term disability ("STD"), it denied her long-term disability ("LTD"). (AR at 898–99.) In doing so, it obtained advice from a board-certified physician who found the medical evidence insufficient to support an impairment determination

2

due to FNP Burton "deferring management, treatment, and presumably disability certification to" Paff's "orthopedic and pain management providers." (AR at 898.) In its denial, Lincoln informed Paff of her right to appeal and requested that she "submit all medical records from the offices of all of [her] treating providers." (*Id.*) Paff appealed that denial. (AR at 48–60.) Lincoln then obtained advice from an independent board-certified physician who reviewed the medical record and found Paff able to perform her occupational duties on a full-time basis. (AR at 18.) Lincoln denied Paff's appeal. (AR at 17–22.) The instant suit followed.

A.   **Plaintiff's Medical History**

Paff suffers from chronic neck and low back pain, neuropathy and radiculopathy, as well as severe facet arthropathy at C2-3 and mild to severe degenerative disc disease. (AR at 48.) Paff underwent cervical fusion surgery in 2015. (AR at 120.)

On August 21, 2021, Paff visited FNP Burton, complaining of continued neck and low back pain. (AR at 152–53.) FNP Burton's progress note from that office visit ("OVN") recorded that Paff was treating her severe facet arthropathy with Dr. Stovall and undergoing regular physical therapy. (*Id.*) At that time, FNP Burton did not recommend any ongoing restrictions and limitations ("R&Ls"), but advised Paff to continue with "PT, Ortho and Pain management," as well as certain lifestyle modifications, including 30 minutes per day of low impact aerobic exercise to slow the progression of her arthritis. (AR at 152.) FNP Burton prescribed prednisone and indicated that Paff could return to work on Monday without restriction. (*Id.*)

Plaintiff appears to have next returned to FNP Burton nearly a year later on August 9, 2022, to discuss Plaintiff's desire to pursue disability benefits. (AR at 150.) FNP Burton advised Plaintiff that she needed to see a specialist for "evaluation/management/determination,"

as "disability must be determined by [a] specialist," and she referred Plaintiff to Tuckahoe Orthopedics. (*Id.*)

Several days later, on August 12, 2022, Plaintiff went to the VCU Medical Center – Emergency Center at New Kent for neck pain and an acute flare up of her chronic back pain, where she received a Toradol injection for symptomatic relief. (AR at 169.) Then, on August 29, 2022, Paff met with Margaret Mackeever, PA-C ("PA Mackeever") at Tuckahoe Orthopedics. (AR at 269–86.) The OVN indicates that Paff and PA Mackeever "had a long discussion regarding [Paff's] ability to work with all her ailments," and PA Mackeever suggested an FCE to determine the level of Plaintiff's impairment. (AR at 276–77.) Plaintiff had cervical CT scans completed on the same date, which showed "stable C3-C7 fusion, [m]oderate right-sided facet arthrosis at C2-C3, and [n]o evidence of fractures or lytic lesions." (AR at 271.) After reviewing Plaintiff's surgical history and updated cervical CT scans, PA Mackeever determined that further surgery would not benefit Plaintiff's symptoms and instead recommended trying another Toradol injection, which Plaintiff declined. (AR at 276.)

Paff underwent the FCE two weeks later, on September 12, 2022, which the Court describes in greater detail below. Following her FCE, on that same day, Paff returned to the VCU Medical Center – Emergency Center at New Kent complaining of neck and back pain. She received another Toradol injection, and the facility discharged her the same day. (AR at 165–

246.) The emergency physician, Dr. Anna Cline, authorized Paff to return to work the following day, September 13, 2022. (AR at 444.)

On September 22, 2022, Plaintiff left her job, starting the 180-day Elimination Period. During that time, Paff provides record of three medical visits to FNP Burton, all with the stated purpose of completing disability forms.

Plaintiff's first visit to FNP Burton during the Elimination Period took place on November 10, 2022. (*Id.*) FNP Burton's OVN states that "patient presents for LTD forms" and that Paff needed to see FNP Burton regularly during claim processing. (*Id.*) The OVN also indicated that Paff needed to follow up with "Ortho regularly for management of symptoms/conditions." (AR at 149.)

On January 16, 2023, Plaintiff returned to FNP Burton, who noted that "[p]atient presents for check in to maintain disability qualification." (AR at 146.) FNP Burton stated that Paff had not needed her steroid shots, but had needed to take her other medications, Tramadol and Diazepam, "for her more busy days." (*Id.*) FNP Burton went on to indicate that "[w]hen [Paff's] neck or back hurt, she can handle it, but when both hurt she knows she will get a shot . . . [and] [w]hen both get bad she feels she can control it with use of [T]ramadol and [Diazepam]." (*Id.*)

On February 17, 2023, Plaintiff returned to FNP Burton for the final time during the Elimination Period, who noted that Paff was checking in for disability qualification and, at that time, was not seeing pain management or orthopedic physicians. FNP Burton again advised Plaintiff to follow up with "Ortho for evaluation/management." (AR at 144.) FNP Burton indicated that she would "continue to fill out forms based on Ortho and/or PT" but was "unable

to be the sole provider of health concerns as this is primary care and she requires management by a specialist." (*Id.*)

Additionally, Paff injured her left knee and left ankle on February 19, 2023 — towards the end of the Elimination Period — while she was deboarding a plane in New York. (AR at 113.) She saw Adam Harlan, P.A., whose records indicate that Paff was diagnosed with an ankle sprain and placed in a boot. (AR at 114.) She later underwent physical therapy for her injury and followed up with Christopher Lake, M.D. (AR at 82–84, 87–93.) Paff also saw a provider at Virginia Urology and underwent surgery in November 2022 for bowel issues unrelated to her claims of disability. (AR at 148, 247–268.)

### B. DPT Blair's Functional Capacity Evaluation ("FCE") and Restrictions and Limitations ("R&L") Form

DPT Blair administered Plaintiff's FCE on September 12, 2022. (AR at 940–48.) The FCE started with Plaintiff responding to a "[p]re-screening [j]ob essential questionnaire" covering "self-reported vocational duties." (AR at 944.) Plaintiff told DPT Blair that she was working full-time, or a 40-hour workweek comprised of 8-hour shifts, 5 days per week with 2 remote days and 3 in-office days. (AR at 943.)

DPT Blair then conducted multiple functional exams over the course of three hours. (AR at 944.) He would cease an activity involved in the FCE "if client surpassed maximum comfortable pain threshold OR if DPT [Blair] noted significant biomechanical changes (which would hinder her participation from safely performing a[n] . . . assessment)." (AR at 943.) DPT Blair's FCE indicated that Paff had a reported 8/10 pain after sitting for more than five minutes in a chair without back support and that her heart rate increased by 10 beats per minutes while sitting during that period. (AR at 947.) Further, DPT Blair noted that Paff had difficulty picking up small objects and had five pounds of force during "key pinch strength" on her left hand and

eight pounds of force on her right hand. (*Id.*) Paff could lift up to three pounds from her waist to shoulder, but when asked to lift five pounds, she reported pain and said that she was unable to continue. (*Id.*) Similarly, when asked to engage in push/pull activities, Paff reported that she was unable to complete the exercise due to pain, and she then proceeded to vomit. (*Id.*) She was able to squat with limited range of motion, stand, bend with limited range of motion and reach with some limitations. (*Id.*) DPT Blair did not perform a walking test due to safety concerns. (*Id.*) Paff vomited several times during the exam, which she attributed to high pain levels. DPT Blair's report remarks that "[i]t is important to note, client reports taking medication on an empty stomach as she did have emesis [i.e. vomiting] during exam." (AR at 944.)

After conducting the FCE, DPT Blair concluded that Paff "is a good candidate for Long Term Disability." (AR at 948.) His evaluation found that Paff "has significant [range of motion] and strength deficits." (AR at 946.) DPT Blair's subsequent Restrictions and Limitations Form indicated that, based on the FCE, he believed that Plaintiff could sit for 3–4 hours per day with breaks, walk for 0–1 hours per day with breaks, stand for 0–1 hours per day with breaks and type for 3–4 hours per day with breaks. (AR at 75–76.) He determined that Paff could safely work up to 3–4 hours per day. (AR at 76.) In his R&L, DPT Blair declined to advise Paff to cease working or "withhold Ms. Paff from work," leaving that determination to FNP Burton. (AR at 75.)

C.   **Report and Letter from FNP Burton**

Lincoln also received a report from FNP Burton dated October 4, 2022. (AR at 937–39.) In her report, FNP Burton opined that Paff qualifies as disabled due to "[c]hronic neck & low back pain, neuropathy & radiculopathy – severe facet arthropathy C2-C3, [and] mod[erate to] severe degenerative disc disease." (AR at 938.) She indicated that the disability would last

7

"lifelong" and that "severe pain impairs patient's ability to perform all job functions." (*Id.*) Additionally, on July 21, 2023, FNP Burton submitted a letter to Paff's attorney indicating that "[e]ven basic tasks, such as standing or sitting for extended periods, are significantly challenging," making it "virtually impossible for [Paff] to return to her previous job or any full-time job." (AR at 73–74.)

## II. LEGAL STANDARD

Courts must review the denial of ERISA benefits "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Johnson v. Am. United Life Ins. Co.*, 716 F.3d 813, 819 (4th Cir. 2013). Here, the administrator had no such discretionary authority and the parties agree that the Court should review Lincoln's determination under a *de novo* standard of review. Plaintiff bears the burden of proving her claim of disability by a preponderance of the evidence. *Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 276 (4th Cir. 2002). Accordingly, the Court must review the Administrative Record and independently assess whether Plaintiff met her burden. *Id.*

"The award of benefits under any ERISA plan is governed in the first instance by the language of the plan itself." *Lockhart v. United Mine Workers of Am. 1974 Pension Tr.*, 5 F.3d 74, 78 (4th Cir. 1993). "One of the primary functions of ERISA is to ensure the integrity of written, bargained-for benefit plans," and "[t]o satisfy this objective, the plain language of an ERISA plan must be enforced in accordance with its literal and natural meaning." *Ret. Comm. of DAK Ams. LLC v. Brewer*, 867 F.3d 471, 481 (4th Cir. 2017) (quotations omitted).

The terms of the Group Policy in question requires that the claimant — namely, Paff — provide Lincoln with "proof" that she qualifies as disabled. (AR at 1051, 1057, 1065.) More

specifically, Plaintiff must submit "standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence" from an attending physician in support of her claim to prove her disability. (AR at 1057.) The Group Policy requires that Paff prove that she was "unable to perform the Material and Substantial Duties of her Own Occupation" throughout a 180-day Elimination Period beginning on the date when she ceased active employment. (AR at 1051–52.) "'Material and Substantial Duties' means responsibilities that are normally required to perform the Covered Person's Own Occupation . . . and cannot be reasonably eliminated or modified." (AR at 1054.)

### III. ANALYSIS

Upon conducting a *de novo* review of the record, the Court concludes that Plaintiff failed to meet her burden of establishing her disability during the required timeframe. Because the Court conducts a *de novo* review, the focus of its inquiry will be on the evidence in the record rather than on the reasonableness of Lincoln's considerations. *Johnson v. Am. United Life Ins. Co.*, 716 F.3d 813, 819 (4th Cir. 2013) (recognizing that a court conducting a *de novo* review should concern itself only with the "correctness, not the reasonableness," of the denial). As indicated above, in addition to her own testimony, Paff primarily relies on two sources of medical evidence to support her claims of disability. In this section, the Court will discuss each in turn, followed by a consideration of additional evidence in the record and some of the arguments that Paff made during briefing.

Before doing so, however, the Court clarifies certain aspects of its review, which the parties disputed during their briefing. In assessing the record, the Court notes that it looks to whether Paff proved her disability by, as the Group Policy requires, submitting "standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical

9

evidence" from an attending physician in support of her claim to prove her disability. (AR 1057.) Plaintiff understands "and/or" as meaning that Plaintiff need not provide "objective medical evidence." The Court interprets this language, however, as requiring objective medical evidence, which can consist of, *inter alia*, "standard diagnosis, chart notes, lab findings, test results, x-rays" or other material. *See Johnson*, 716 F.3d at 819 ("A paramount principle of contract law requires us to enforce the terms of an ERISA insurance plan according to 'the plan's plain language in its ordinary sense.'"). Although the Court provides due consideration to Plaintiff's subjective complaints, it also considers objective medical evidence and the degree to which such evidence supports Plaintiff's subjective complaints in making its ultimate determination of whether Plaintiff has met her burden. *See Larson v. Old Dominion Freight Line, Inc.*, 481 F. Supp. 2d 451, 459 (M.D.N.C. 2007), *aff'd*, 277 F. App'x 318 (4th Cir. 2008) (stating that plan administrators and courts "should consider the degree to which subjective complaints are supported by objective evidence of disability and the degree to which other evidence refutes such claims").

### A. Functional Capacity Examination

In support of her claim, Paff offers a September 12, 2022 FCE by FPT Blair involving three hours of testing. (AR940-48.) Courts often regard FCEs by qualified evaluators as reliable evidence of functional restrictions and limitations, but only when the evaluations rest on objectivity and meaningful validity performance testing. *Dunham-Zemberi v. Lincoln Life Assurance Co. of Bos.*, 629 F. Supp. 3d 1220, 1231–32 (S.D. Fla. 2022) (collecting cases). The value of the FCE relies in large part on objective testing and the claimant giving full, truthful

10

effort in the testing.  Without validity measures, FCEs can become overly reliant on claimant's self-assessments, as opposed to independently verifiable indicators of a claimant's abilities.

Published guidance on FCE best practices advise that FCEs allow for up to 8 hours, conducted over a one-to-two-day period and should include "[o]bjective diagnostic tests" in the form of "[p]hysiological monitoring [that] includes regular assessment of heart rate for safety reasons and also as an indicator of an individual's effort level during testing." *See* Steve Allison, *et al.*, *Current Concepts in Functional Capacity Evaluations: A Best Practices Guidelines*, Academy of Orthopaedic Physical Therapy (2018), https://perma.cc/56K8-V9ZC (cited in *Dunham-Zemberi*, 629 F. Supp. 3d at 1231–32).  When an indicator reports an acute increase in pain during the FCE, the physiological responses monitored could include increased heart rate, blood pressure, and breathing rate; diaphoresis; and pupil dilation. *Id.* at 12.  With regard to the patient's performance or effort level, "[i]t is recommended that Examiners make determinations about effort based on the presence of physiological and biomechanical signs (i.e., heart rate, respiration rate, muscle recruitment, and consistency of movement patterns) in combination with clinical examination findings and symptom reports." *Id.* at 17.  If the examiner performs tests, including physiological and biomechanical tests, the examiner should document such results in his or her report. *Id.* at 19.

Although DPT Blair's FCE need not accord with every best practice to provide credible evidence of disability, the FCE's notable lack of validity testing diminishes the weight that the Court affords it, as does DPT Blair's over-reliance on Paff's self-reported tolerances.  Apart from assessing her baseline, DPT Blair only reports having measured Paff's heart rate at two points during the exam — noting a 10-point increase in her heartrate while sitting and a six-point increase after weighted activities.  While DPT Blair states that he believes Paff gave "maximum

11

effort" (AR944), he does not provide a sufficient objective basis for that conclusion. As such, the Court cannot give the FCE as much weight as it perhaps would have carried had it been corroborated by standard and objective measures of validity.

Paff's vomiting cannot suffice to show that she had reached a pain threshold during the exam. While Paff attributes the vomiting to her pain, DPT Blair's report indicates a more plausible explanation for such a response — the anti-anxiety medication that she took on an empty stomach prior to the exam. Thus, the Court does not consider Paff's vomiting effective validation of her pain during the FCE. The lack of validity measures makes it difficult for the Court to assess whether Paff did, in fact, exert maximum effort during the assessments and, by extension, whether the FCE accurately reports the extend of her capacities.

Additionally, the relative lack of detail and explanation in DPT Blair's report limits the weight that the Court affords his conclusions. For example, DPT Blair indicates that Plaintiff cannot return to work because of her limited sitting tolerances (AR948), but he does not explain whether this takes into consideration the "ergonomic setup" that Paff reported having while at work (AR943.) Indeed, he reports only assessing Plaintiff's ability to sit "unsupported" and without any "back support." (AR947.) While the Court does not completely disregard the FCE, it finds the FCE insufficient to allow Paff to carry her burden to prove her disability during the requisite timeframe.

### B. FNP Burton's Report and Letter

An ERISA administrator need not defer to treating physicians' opinions. *See Black & Decker Disability Plan v. Noord*, 538 U.S. 822, 834 (2003) (administrator has no duty to defer to treating physicians and no discrete burden of explaining disagreements because, in part, "a treating physician 'may favor a finding of disability'"); *Franklin v. Metro Life Ins. Co.*, 432 F.

App'x 210, 215 (4th Cir. 2011) ("ERISA does not require that administrators accord special deference to the opinions of treating physicians."). Here, although it credits FNP Burton's report and letter, the Court finds such material insufficient to constitute the requisite proof of Paff's disability.

FNP Burton, who is not herself a specialist and repeatedly reiterated the need for Paff to see a specialist, does not provide credible, objective evidence of disability. FNP Burton's earlier records indicated that she felt that Paff's "disability must be determined by a specialist" and she does not address why, in the end, she was qualified to opine on Paff's disability status. (AR at 150.) Further, FNP Burton's reports of Paff's claimed physical restrictions and limitations reflect little detail and lack support from any credible, objective evidence relevant to her opinions. Her report is conclusory and, for the most part, merely record her patient's subjective complaints. However, "[s]ubjective complaints do not automatically become objective medical findings when penned by a doctor." *Joyner v. Cont'l Cas. Co.*, 2013 WL 865846, at *13 (W.D. Va. Mar. 7, 2013). FNP Burton's report and letter alone do not provide the objective evidence necessary to prove disability.

Moreover, FNP Burton's statements do not cohere with contemporaneous medical records. Despite allegedly experiencing debilitating pain, Paff received limited treatment during the Elimination Period. She met with FNP Burton only three times during this period, and FNP Burton's OVNs indicates that the purpose of these limited visits was to discuss Paff's disability claims rather than for Paff to receive treatment. (AR at 144 ("Patient presents for check in to maintain disability qualification."); AR at 146 (same); AR at 148 ("Patient presents for LTD forms.").) Plaintiff stated during her January 16, 2023 and February 17, 2023 visits with FNP Burton that she had not needed steroid shots and that she could handle and control simultaneous

neck and back pain with Tramadol and Diazepam or an occasional shot. (AR at 144, 146.) As of February 2023, Paff was not seeing pain management or orthopedic specialists. (AR at 144.) And despite FNP Burton's statement in her July 21, 2023 report that pain impacted Paff's "concentration, memory, and overall cognitive function," (AR at 73), her contemporaneous OVNs lack any indication of such complaints or evidence of those issues.

### C. Other Evidence

Paff also submitted a personal statement in the form of a transcribed conversation with a member of her attorney's legal team, describing how her disability affects her daily life, her work and her experiences with the FCE. (AR at 63–70.) While the Court takes into consideration Paff's subjective complaints here and elsewhere in the Administrative Record, her self-assessment cannot serve as a substitute for objective medical evidence that the Group Policy requires. Additionally, her personal statement focused more on the toll that her purported disability takes on her personal life and recreational pursuits, while providing limited insight into the impact on her ability to work. (AR at 844–47.)

Although Lincoln requested complete medical files from all of her providers, Paff provided limited records from her orthopedic specialists regarding her purported disability, and she does not offer any reports from her treating specialists supporting her claim that she is disabled under the Plan.[2] The absence of any significant, disability-related records from Paff's

---

[2] The limited orthopedic records that Paff provides largely post-date the Elimination Period and concern her February 2023 ankle injury (AR at 330–50, 359–65), thus offering limited insight into the disability that she claims forced her to leave her job in September 2022. Paff also submitted records from visits to Dr. Matthew Walker and Dr. Bradley Stovall on April 14, 2023 and April 17, 2023, respectively (also post-dating the Elimination Period), regarding pain in her right shoulder, but these similarly fail to prove Plaintiff's disability. (AR at 351–57.) In fact, Dr. Stovall's notes reflect that her medication "has helped her control her pain and provide functional improvements" and that "things are overall controlled." (AR at 354, 356.)

14

...

orthopedic and physical therapy providers sparks some questions for the Court, particularly given that FNP Burton repeatedly urged Paff to see such providers (AR at 149, 144) and, during the Elimination Period, indicated that Paff "follows up appropriately with her specialists" (AR at 146). DPT Blair's FCE report also indicates that Paff was seeing orthopedic and physical therapy providers. (AR at 371.) Lincoln specifically requested that Paff submit all of her medical records for consideration of her claim upon appeal, but Paff seems to have neglected to do so. Thus, it appears that Paff implicitly acknowledges that this other medical evidence cannot help her case. Even if Paff were not, in fact, seeing such providers — as indeed, FNP Burton reports that Paff was not seeing "pain management or ortho" towards the end of the Elimination Period (AR at 144) — this too would raise questions of why she failed to seek care to address her supposedly disabling pain.

### D. Paff's Other Arguments

Paff claims, incorrectly, that Lincoln failed to abide by ERISA's procedural requirements. Paff accurately states that "the administrator must comply with [ERISA's] procedural guidelines." *Hall v. Metro. Life Ins. Co.*, 259 F. App'x 589, 593 (4th Cir. 2007). "The statutory and regulatory text and the case law demand that judicial review take into account only reasons for an adverse benefits determination offered in the initial denial notice, because these are the only rationales on which a claimant might have arguably been given a 'full and fair' opportunity to respond during the administrative process." *Id.* These safeguards prevent a claimant from "being 'sandbagged by post-hoc justifications of plan decisions." *Id.* Here, Lincoln rested its denial of Plaintiff's claim on the absence of information establishing her disability. It gave her the opportunity to submit additional records, including any records from

the specialists treating her. She failed to do so. She cannot now argue that she lacked a full and fair opportunity to respond during the administrative process.

Plaintiff's arguments that Lincoln remains bound by its earlier decision to grant Plaintiff STD benefits similarly proves unavailing. Administrators make STD determinations on shorter timeframes and often on incomplete information. Courts have repeatedly held that approval of an STD claim does not create "a 'straitjacket' requiring [a claim administrator] to award [a claimant" further benefits under the LTD Plan. *Pini v. First Unum Life Ins. Co.*, 981 F. Supp. 2d 386, 414 (W.D. Pa. 2013).

Additionally, Paff argues that Lincoln's determinations are unreliable because Dr. William M. Barreto, the independent physician to whom Lincoln sent Paff's file for review, misstated Paff's age and gender in the introductory paragraph of his report. The Court acknowledges that Dr. Barretto's report included the error that Plaintiff identifies, was not based on any personal examination of Plaintiff, and included only superficial analysis. As such, the Court does not afford much weight to Dr. Barretto's conclusions. Nonetheless, in the end, Plaintiff has the burden to prove her disability; Lincoln need not disprove it. Thus, Plaintiff's attempts to refocus the Court's inquiry on what Lincoln did and did not show prove misplaced.

\* \* \*

For the reasons stated above, Paff's Motion for Judgment on the Record (ECF No. 17)

will be DENIED and Lincoln's Motion for Judgment on the Record (ECF No. 15) will be GRANTED. Judgment will be entered for Lincoln and against Paff.

An appropriate order shall issue.

Let the Clerk file a copy of this Memorandum Opinion and notify all counsel of record.

_____/s/_____<br>
David J. Novak<br>
United States District Judge

Alexandria, Virginia
Date: October 1, 2024

17